UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRACY AUGUST, et al.,

     Plaintiffs,                       Case No. 2:16-cv-11224

v.                                HONORABLE STEPHEN J. MURPHY, III

MICHIGAN DEPARTMENT OF
CORRECTIONS, et al.,

     Defendants.

_____/

**OPINION AND ORDER DENYING
PLAINTIFFS' MOTION AND AMENDED MOTION
FOR CLASS CERTIFICATION [39, 40], AND GRANTING IN PART
AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [41]**

     Plaintiffs alleged the Huron Valley Women's Correctional Facility ("Facility") in Ypsilanti is overcrowded. Defendants mostly agree. The Michigan Department of Corrections ("MDOC") has taken measures to deal with the problem, but Plaintiffs—who are current and former inmates there—aver that the purported solutions are inadequate. Their putative class-action complaint asserts that prison conditions, and the actions of those who run the Facility, violate the Eighth Amendment. Plaintiffs moved to have their putative class certified, and Defendants have moved for summary judgment. The Court held a hearing on the motions on August 1, 2018, and for the reasons below, will deny the motion for class certification and grant in part the motion for summary judgment.

## BACKGROUND

     The Facility was built in the 1980s, but in 2009 it became Michigan's sole prison housing only female inmates. ECF 24, PgID 225; ECF 43-21, PgID 1655. As of January 2010, the Facility housed 1,741 inmates and had a net operating capacity to house 1,871.

ECF 43-2, PgID 1075. Over the next few years, the building size remained constant, but the inmate population grew: in 2011 there were 1,835 inmates and by 2014 there were 2,020. ECF 43-2, PgID 1075. To solve the need for space—in particular, space for beds— the former prison warden, Millicent Warren, began talking with representatives from the Facility's physical plant and fire and safety teams about ways to increase the prison's operating capacity. ECF 43-16, PgID 1612. They discussed the prospect of a new building, but ultimately the solution they conceived was to convert existing rooms into cells with bunk beds. *Id.* at 1614.

The process of converting space varied. The warden had to get approval from the physical plant if conversion meant putting up or taking down walls, or if the character of the space fundamentally changed—for instance, when a gymnasium was converted to sleeping quarters. *Id.* at 1613–14. The fire and safety teams would consider how the changes affected egresses and air flow and always had to sign off on the conversions. *Id.* at 1612–13. Warren always updated one of MDOC's regional administrators about the plans. *Id.* at 1613–14.

MDOC increased the official net operating capacity of the prison to 2,340 inmates by 2017, and actually housed 2,231 inmates—490 more than it had in 2010. ECF 43-2, PgID 1075. But Plaintiffs suggest that putting so many inmates in a building that was not built for them created hardships for the inmates. The complaint provides a non-exhaustive list of the allegedly dangerous conditions:

(A)    There is not enough warm clothing, shoes, socks and other basic items to clothe them.

(B)    There are long waiting lists and delay for medical treatment and follow-up.

(C)     Inmates are packed into former closets and other converted rooms that are too small to accommodate the number of inmates.

(D)     Inmates are kept in cells most of the day, some as long as 20–23 hours, because it is too crowded to permit individuals to use other parts of the facility.

(E)     Visits with family have been shortened making visits more difficult.

(F)     Limited use of day rooms, confining inmates to their cells and closing them off from other potential activities and contacts.

(G)     There are long waiting lists for classes inmates must take to be eligible for early release and to meet parole board requirements.

(H)     Materials such as library books are not available so that inmates cannot occupy their time while confined for long periods of time in their cells.

(I)     For lack of room, inmates who have been the victims of sex abuse are housed with individuals who are sex abusers;

(J)     Some cells leave little room to move around, which, combined with the fact that inmates spend so much time within the cells, is psychologically devastating.

ECF 1, PgID 3–4. The adverse effects of overcrowding cited by the Plaintiffs can be condensed into seven categories: (1) cell size, (2) temperature and ventilation, (3) waitlists for classes, (4) weather exposure, (5) inadequate clothing, (6) medical treatment, and (7) psychological impact.

Plaintiffs named three Defendants in the complaint: (1) the MDOC, (2) its director, Heidi Washington, and (3) the Facility's warden, Anthony Stewart. Both parties agree that the MDOC is immune from suit pursuant to the Eleventh Amendment,[1] and the case now proceeds solely against the individual defendants.

---

[1] Plaintiffs initially contested this proposition in their response brief, ECF 43, but at the August 1, 2018 hearing conceded that MDOC is immune from suit. Accordingly, the Court will dismiss the complaint as to Defendant MDOC.

**STANDARDS OF REVIEW**

I.    <u>Motion to Certify Class</u>

Civil Rule 23 governs class action lawsuits. A matter may proceed as a class action in the name of the representative parties if

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). A class must meet the above prerequisites, as well as fall within one of the class types identified by Rule 23(b). *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (citing *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996)). Class actions are an exception to the norm and a plaintiff bears the burden to show that class certification is appropriate. *See Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537 (6th Cir. 2012) (citations omitted).

Federal courts possess "broad discretion in deciding whether to certify a class," but must do so "within the framework of Rule 23." *Am. Med. Sys.*, 75 F.3d at 1079 (citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100, 101 (1981)). Courts must conduct a rigorous analysis into whether the party seeking certification meets Rule 23's prerequisites. *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 560 (6th Cir. 2007) (citing *Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003)). The rigorous analysis may require the Court "to probe behind the pleadings before coming to rest on the certification question." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982). "[O]rdinarily the determination should be predicated on more information than the pleadings will provide." *Am. Med. Sys.*, 75 F.3d at 1079

(quoting *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974)). The Court, therefore, must explore the nature of the alleged harms and the evidence supporting them. *Cf. Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (recognizing that vetting a proposed class necessarily entails "some overlap with the merits" because it "generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action") (internal quotations omitted).

II.    <u>Motion for Summary Judgment</u>

The Court will review the motion's remaining arguments under the Rule 56 standard, which requires the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must identify specific portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party may not simply rest on the pleadings but must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted) (quoting Fed. R. Civ. P. 56(e)).

A fact is material if proof of that fact would establish or refute an essential element of the cause of action or defense. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). A dispute over material facts is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences "in the light most favorable to the non-moving

party." *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987) (citations omitted).

**LEGAL STANDARD**

The Eighth Amendment of the United States Constitution prohibits "cruel and unusual" punishments, which the Supreme Court has interpreted to forbid various conditions of confinement. Specifically, the Eighth Amendment "forbids conditions that involve the 'wanton and unnecessary infliction of pain,' or are 'grossly disproportionate to the severity of the crime[.]'" *Hadix v. Johnson*, 367 F.3d 513, 525 (6th Cir. 2004) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Plaintiffs asserting Eighth Amendment violations based on prison conditions must establish two things: "(1) a single, identifiable necessity of civilized human existence is being denied (objective prong) and (2) the defendant prison official acted with a sufficiently culpable state of mind." *Id.*

Both prongs are demanding. Under the objective prong, there must be an "extreme deprivation[]" that denies "the minimal civilized measure of life's necessities." *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) and *Rhodes*, 452 U.S. at 347). "Harsh and uncomfortable prison conditions do not automatically create such a violation." *Id.* (citing *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997)). To satisfy the subjective prong, the plaintiff must show that the defendant was "aware of the facts from which the inference could be drawn that a substantial risk of serious harm" existed, drew the inference, and failed to take "reasonable steps to avert the harm." *Id.* (internal quotations omitted). Mere negligent exposure to a risk is not enough. *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 835–36 (1994)).

**DISCUSSION**

The parties disagree on which motion the Court should resolve first. Plaintiffs urge resolution of the class certification motion. Defendants suggest beginning by considering the motion for summary judgment. Good reasons exist for both approaches. On the one hand, Rule 23 directs the Court to resolve class-certification motions early on in a case. Fed. R. Civ. P. 23(c)(1)(A). Additionally, the so-called "rule against one-way intervention" counsels courts to first define a class and then reach the merits to prevent "potential plaintiffs from awaiting merits rulings in a class action before deciding whether to intervene in that class action," *Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 432 (6th Cir. 2012) (citing *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 546 (1974)). On the other hand, courts may, in their discretion, conclude that deciding a summary judgment motion first is "likely to protect both the parties and the court from needless and costly further litigation." *Thompson v. Cty. of Medina*, 29 F.3d 238, 241 (6th Cir. 1994) (quoting *Wright v. Schock*, 742 F.2d 541, 544 (9th Cir. 1984)). The Court will thus first address the class-certification motion and then turn to the summary judgment motion.

III.    Motion to Certify Class

Plaintiffs have asked the Court to certify the following proposed class: "all individuals who have been incarcerated at [the Facility] at any time from April 4, 2010[2] to the present." ECF 39, PgID 371, 390. Plaintiffs represent that the proposed class "encompass[es] all prisoners subject[ed] to the inhumanity of overcrowding and the adjunct problems arising from overcrowding such as waiting in lines in the cold and rain,

_____

[2] Neither party disputes the start date in the class definition. The Court therefore assumes that the Facility became overcrowded on April 4, 2010.

not enough personal space, delay in medical treatment, and lack of clothing and necessities." ECF 46, PgID 1692.

Plaintiffs must show that the proposed class satisfies four requirements: (1) numerosity, (2) commonality, (3) typicality, and (4) adequate representation. *See* Fed. R. Civ. P. 23(a). Here, the commonality and typicality requirements seem not to be met. Although Rule 23(a)'s "commonality and typicality requirements . . . tend to merge," the Court will address only commonality. *Dukes*, 564 U.S. at 349 n.5 (quoting *Falcon*, 457 U.S. at 157–58 n.13) (addressing the commonality requirement and declining to address typicality because the class lacked commonality).

Rule 23(a)(2) provides that class action certification is appropriate only if there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality looks to the questions of law or fact "among the class members generally," 1 Newberg on Class Actions § 3:26 (5th ed. 2018) and seeks "to generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009)) (emphasis omitted). A common question of law or fact exists when it can be shown that all class members suffered the same injury. *Dukes*, 563 U.S. at 349–50. Class claims must depend upon a common contention "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350.

For Eighth Amendment violations in the prison context, there must be "extreme deprivations" that deny the class "the minimal civilized measure of life's necessities." *Hadix*, 367 F.3d at 525 (quoting *Hudson*, 503 U.S. at 9 and *Rhodes*, 452 U.S. at 347).

Plaintiffs contend that the overcrowded conditions at the Facility result in all inmates enduring "lack of dayroom and program space, long lines and curtailments in the food service, long waits, lines and shortages at the medical service and lack of proper clothing and hygiene products." ECF 39, PgID 372. They further maintain that the Facility's population "contributes to increased suicides, assaults, commotion, and noise level," which in turn "cause[] mental difficulties such as PTSD and ADHD." *Id.*

Plaintiffs' proposed class does not satisfy Rule 23(a)'s commonality requirement. The varied harms alleged would require individualized fact-finding to analyze each member's Eighth Amendment claim. The diversity of alleged harms precludes classwide resolution of whether the Defendants' conduct resulted in an extreme deprivation of civilized life's minimal necessities.

First, Plaintiffs complain that prisoners wait in line for food or medical treatment in varying weather conditions. The harm could deviate substantially for each putative class member. An inmate could have been subjected to various types of weather: extreme heat, torrential rain, snow on a cold day, temperatures well below freezing, or normal weather. Moreover, the length of time spent standing in line would vary from inmate to inmate and from day to day. For example, any number of inmates may have waited for one hour in extreme heat, whereas a different number of inmates may have waited for five minutes in snowy conditions.

Second, Plaintiffs aver that they suffer from inadequately-sized cells. The Facility's cells differ in size and occupancy. Moreover, the Facility assigns prisoners to their cells for varying hours depending upon each of their security levels. Plaintiffs' counsel acknowledged the different deprivations during the motion hearing, noting that the

deprivations suffered by inmates in a 16-person cell differ from the deprivations of inmates in four-person or two-person cells. The differences are further exacerbated when considering that the length of time spent in the cell affects whether the cell size results in an extreme deprivation.[3]

Third, Plaintiffs allege they received delayed medical treatment. Each inmate presents differing medical needs, however, because they possess diverse medical conditions and histories. Furthermore, medical needs differ in the degree of urgency. For example, the extreme consequence of the deprivation suffered from delayed medical treatment for a superficial cut would be different from that suffered for denial of emergency medical care. Plaintiffs' counsel observed the distinction at the motion hearing stating that August has specific medical needs that may require different access to care than those of other class members.[4]

Fourth, Plaintiffs allege inadequate provision of clothing and other necessities. But they do not allege inadequate provision of particular items common to all putative class members. Deprivations of one clothing item over another would affect the Court's analysis. For example, an inmate with shoes that are too big suffers a different harm from an inmate who does not have a coat. The same could be said for other necessities.

---

[3] Dr. Atlas's Report demonstrates the variation. *Compare* ECF 43-3, PgID 1098–99, 1100, 1102 (under seal) (Units Two and Three inmates have 17.75 square feet of unencumbered space, Units Four and Five inmates have 15.7 square feet of unencumbered space) *with id.* at 1104–11 (Emmet Hall's smallest room has ten square feet per inmate, but the room size in Calhoun Hall, Dickinson Hall, and Gladwin Hall ranges from 18 to 52.5 square feet per inmate). *See also id.* at 1111 (Lenawee Hall provides 36 square feet per inmate), 1112–13 (Kent Hall, the infirmary, provides 81.5 square feet to inmates in the dorm and 96 square feet in single-person cells).

[4] The specific example concerns not only typicality but also commonality because it highlights the lack of common answers among class members.

Lacking certain feminine-hygiene products can create a greater deprivation than not having a toothbrush. Further, at the motion hearing, Plaintiffs' counsel discussed the lack of uniform meal distribution. In particular, Plaintiffs' counsel represented that inmates in the front of the food line received more food than those in the back. The provision of different amounts of food affects different deprivations and could vary from day to day (depending on where a putative class member stood in line).

Finally, Plaintiffs complain that the Facility's conditions exacerbate or create psychological trauma. Prisoners each have distinct mental health backgrounds, and the impact of the Facility's conditions will impact each differently. The varying levels of impact will dictate whether the putative class members suffered extreme deprivations.

The Eighth Amendment analysis requires the Court to determine whether the Defendants' conducted resulted in extreme deprivations of civilized life's minimum necessities. The putative class members each present distinct factual circumstances of varying harms. The different degrees and different forms of deprivation defy classwide resolution of the question presented by the putative class because determination of the truth or falsity of an alleged deprivation for one class member will not "resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 563 U.S at 350. The Court, therefore, will not certify the class.

IV.     Defendant's Motion for Summary Judgment

Because the Court declines to certify the class, the Court will consider only the claims of the three named Plaintiffs—Tracy August, Melissa Memmer, and April Hutchison.[5]

A.     MDOC Enjoys Eleventh Amendment Immunity.

At the motion hearing, Plaintiffs properly conceded that MDOC enjoys immunity from suit under the Eleventh Amendment. *See Sims v. Mich. Dep't of Corr.*, 23 F. App'x 214, 215 (6th Cir. 2001) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 (1984)) ("Because the MDOC is a state agency and the state of Michigan has not consented to civil rights suits in the federal courts, the MDOC is entitled to Eleventh Amendment immunity.").

B.     Plaintiffs Cannot Sue Washington or Stewart in Their Official Capacities for Monetary Damages.

Plaintiffs also sued Heidi Washington, Director of MDOC, and Anthony Stewart, the Facility's warden, in their official capacities. A suit for monetary damages against state officials in their official capacities is simply "another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). An official-capacity suit against state officials is treated as a suit against the state. *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (citing *Graham*, 473 U.S. at 166). Plaintiffs, therefore, cannot sue either Washington or Stewart in their official capacities for damages because they enjoy Eleventh Amendment immunity as official agents of MDOC.

---

[5] At the motion hearing, Defendants conceded that they were not challenging the three named Plaintiffs' standing to sue.

C.      Two Plaintiffs Can Sue Washington and Stewart in Their Official Capacities for Injunctive Relief.

Eleventh Amendment immunity does not bar injunctive relief against state officials in their official capacities. *Wolfel v. Morris*, 972 F.2d 712, 719 (6th Cir. 1992); *see also Ex Parte Young*, 209 U.S. 123 (1908). "[A] state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Wolfel*, 972 F.2d at 719 (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 73–74, n.10 (1989)).

Memmer and Hutchison remain in state custody and their claims for injunctive relief against Washington and Stewart may proceed. August was released from the Facility in December 2017, however, and therefore is not entitled to injunctive relief. *See* Biographical Information, Michigan Department of Corrections: OTIS Search, "Tracy August" (last accessed September 25, 2018);[6] *see also Moore v. Curtis*, 68 F. App'x 561, 562 (6th Cir. 2003) (citing *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996)) (noting that a "prisoner's request for injunctive and declaratory relief is moot" when the prisoner is no longer incarcerated).

In addressing the motion for summary judgment, the Court will therefore consider (1) August's claims for monetary relief against Washington and Stewart in their individual capacities, (2) Memmer and Hutchison's claims for injunctive and monetary relief against Washington and Stewart in their individual capacities, and (3) Memmer and Hutchison's claims for injunctive relief only against Washington and Stewart in their official capacities.

---

[6] *Available at*:
http://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=714643.

D.    Understanding Plaintiffs' Claims

Plaintiffs' complaint asserts amorphous claims and does not describe the constitutional right at issue with particularity. *See* ECF 1, PgID 3–4 (identifying the issue as overcrowding and listing its adverse effects). In their response to the motion for summary judgment, however, Plaintiffs propose a totality of the conditions theory for the claims. *See* ECF 43, PgID 1056. Plaintiffs contend that "[i]n actions challenging a large number of prison conditions, the issue is whether 'the challenged conditions alone or in combination'" violate the Eighth Amendment because "the totality of the conditions 'may deprive inmates of the minimal civilized measure of life's necessities.'" *Id.* at 1056 (quoting *Peterkin v. Jeffes*, 855 F.2d 1021, 1024 (3d Cir. 1988) (quoting *Rhodes*, 452 U.S. at 347)). Plaintiffs aver that relevant prison conditions include "basic human needs such as food, shelter, and medical care, as well as sanitation, safety, the physical plant, educational/rehabilitational [sic] programs, the length of confinement, and out-of-cell time." *Id.* at 1056–57 (citing *Peterkin*, 855 F.2d at 1025).

The Third Circuit's *Peterkin* decision preceded the Supreme Court's decision in *Wilson v. Seiter*. In *Wilson*, the Supreme Court clarified that

> [s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets."

*Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (emphasis omitted). The Supreme Court clarified that not "all prison conditions are a seamless web for Eighth Amendment purposes." *Id.* at 305. The Supreme Court explained that "[n]othing so amorphous as

'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.*

The Sixth Circuit has "refuse[d] to conduct a totality of the circumstances analysis in Eighth Amendment cases." *Schrader v. Collins*, 166 F.3d 1215, at *2 (6th Cir. 1998) (Table) (citing *Thompson*, 29 F.3d at 242). Rather, a plaintiff "must identify a specific condition that violates the inmates' right to personal safety." *Thompson*, 29 F.3d at 242 (citing *Walker v. Mintzes*, 771 F.2d 920, 925 (6th Cir. 1985)). No Eighth Amendment violation exists if "each of these basic needs [food, clothing, shelter, sanitation, medical care, and personal safety] is separately met. . . . A number of conditions, each of which satisfy Eighth Amendment requirements, cannot in combination amount to an Eighth Amendment violation." *Walker*, 771 F.2d at 926 (quoting *Hoptowit v. Ray*, 682 F.2d 1237, 1246–47 (9th Cir. 1982)) (alteration in the original).

Because *Wilson* and Sixth Circuit precedent require plaintiffs to identify a specific condition depriving them of a basic need, the Sixth Circuit has categorized "factual scenarios that frequently arise" into types, such as "conditions-of-confinement, excessive-force, and medical needs." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 569 (6th Cir. 2013).

"The Eighth Amendment is concerned only with 'deprivations of essential food, medical care, or sanitation' or 'other conditions intolerable for prison confinement.'" *Richmond v. Settles*, 450 F. App'x 448, 454 (6th Cir. 2011) (quoting *Rhodes*, 452 U.S. at 348). A conditions of confinement claim under the Eighth Amendment "contains both an objective and a subjective component." *Id.* at 455 (quoting *Wilson*, 501 U.S. at 298).

"The objective component requires an inmate to show that the alleged deprivation

is 'sufficiently serious'"—i.e., the conditions pose "a substantial risk of serious harm." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (quoting *Farmer*, 511 U.S. at 834). The subjective component requires the inmates to show that the prison officials had "a sufficiently culpable state of mind," which is "one of 'deliberate indifference[.]'" *Id.* (quoting *Farmer*, 511 U.S. at 834). A plaintiff satisfies the standard by showing that the state officials were both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and the official "must also draw the inference." *Id.* (quoting *Farmer*, 511 U.S. at 835, 837). The Court will address "the subjective component individually for each defendant." *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) (citing *Garretson v. Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005)).

For simplicity, the Court will first discuss Hutchison and Memmer's claims and then address August's claims.

E.    Hutchison and Memmer's Allegations

Hutchison declared that she was housed in a former day room with fifteen other inmates. ECF 43-6, PgID 1398. The room did not have a toilet or sink, so the inmates used the toilet and sink from a nearby vacant cell. *Id.* at 1398–99. Hutchison claims she spends an average of 22 hours per day in her cell. *Id.* at 1400. Further, she recounts an instance in which a fellow inmate bit her and they were both placed in segregation. *Id.* Other complaints included undercooked food, insufficient access to and space in the day room, fighting in the day room, and limited access to the yards. *Id.* at 1399–1400. The alleged conditions "have caused [her] extreme anxiety, depression and anger, as described" in Dr. Koch's report. *Id.* at 1400.

Memmer declared that she was housed in a two-person cell consisting of 72 square feet. ECF 43-7, PgID 1402. She complained that the Facility removed her unit's day and exercise rooms, and that the only available day room is so small that a schedule is required. *Id.* at 1402–03. Further, she noted severely limited access to programs or to the law library. *Id.* at 1403. She also claims she is "chronically short" of blouses, shorts, and t-shirts. *Id.* She complains of long lines for food and undercooked meals. *Id.* Lines also amass near the showers and telephones. *Id.* She "normally spends 21–22 hours per day" in her cell because of the lack of day room space, programming, and decreased access to the yard or visiting rooms. *Id.* at 1404. The conditions have produced "panic attacks and anxiety" which has caused her to sleep more, eat less, and exhibit angry behavior. *Id.*

Assuming Hutchison and Memmer's claims satisfied the objective prong, they failed to produce facts to show that either Director Washington or Warden Stewart knew of their circumstances at the Facility or that they faced a substantial risk of serious harm. *See* ECF 43, PgID 1062–64.[7] In the absence of "facts from which the inference" could be drawn that Memmer and Hutchison faced a substantial risk of serious harm or that Defendants drew the inference, Memmer and Hutchison's Eighth Amendment claims fail. *Bargery*, 207 F.3d at 867 (quoting *Farmer*, 511 U.S. at 835);

---

[7] Plaintiffs contend that the subjective prong may be demonstrated with circumstantial evidence, ECF 43, PgID 1063 (citing *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009)), but the Plaintiffs would have to demonstrate facts that the defendants "knew that serious risks accompan[ied]" the complained-of conditions, *Dominguez*, 555 F.3d at 550 (finding a medical professional would know the risks associated with severe dehydration). *See also Santiago v. Ringle*, 734 F.3d 585, 591–92 (6th Cir. 2013) (finding that prison doctors did not know of serious risk accompanying the plaintiff's medical condition). Here, there is no evidence to show that either Washington or Stewart knew of the serious risks that allegedly accompanied the conditions at the Facility.

F.     August's Allegations

August's alleged Eighth Amendment violations fall within two categories: a conditions-of-confinement claim and a medical-needs claim. The conditions-of-confinement claim relates to alleged deprivations of food, clothing, shelter, sanitation, or personal safety. *See Villegas*, 709 F.3d at 570. The medical-needs claim relates to "deprivation of medical care" or "interference with a prescribed treatment plan." *Id.* at 569.

*1. Facts Presented*

On June 17, 2015, August sent Warden Stewart a letter describing overcrowding at the Facility. August complained of "extremely limited" medical treatment resulting from "overcrowding and understaffing of the mental health department[.]" ECF 43-5, PgID 1380. She claimed that the prison population exacerbated her mental health concerns and noted the diminution of day room space in her unit. *Id.*

Then, between December 2015 and February 2016, August sent three letters to both Warden Stewart and Director Washington. *See id.* at 1385–91. The first letter identified her difficulties receiving mental health care. *Id.* at 1385 (describing the understaffed mental health department and saying that the holidays were "really [a]ffecting [her] emotionally and physically"). The rest of the letter suggested changes to the day room.

The second letter contained more serious concerns. August reiterated that she suffered from PTSD, depression, anxiety, OCD, and bipolar personality disorders. *Id.* at 1387. She also alleged that a staff member and other inmates sexually abused her. *Id.* Moreover, August noted that her medication for mental health had been raised repeatedly during her incarceration, and that she filed grievances when mental health staff were

unavailable. *Id.* She noted the perceived dangerous conditions of the Facility, which she connected to prisoners spending more time in their cells. *Id.* Finally, she expressed concern that she had been housed with a convicted sexual predator. *Id.* at 1388.

The third letter reiterated her concerns about sexual assault at the Facility, her placement with the sexual predator, her delayed meetings with mental health professionals, and the lack of day room space. *Id.* at 1390. She further noted that the crowded conditions prompted violence, which exacerbated her mental health issues. *Id.*

Additionally, on February 24, 2016, August filed a grievance describing how the Facility's overcrowded conditions had caused her "to suffer in severe unnecessary physical pain" and had exacerbated her mental illness. *Id.* at 1371. The grievance contained nine "overcrowding issues" including: denial of effective mental health care, denial of effective health care, extremely hostile environment, lack of supervision by staff, long lines to eat, difficulties filing grievances, sexual abuse and physical harm, drug problems, and officer misconduct. *Id.* at 1372–74. The grievance was rejected as a joint grievance, and Warden Stewart signed a step II response upholding the rejection. *Id.* at 1376, 1378.

### 2. Conditions of Confinement

#### a. Objective Component

August presented concerns that the conditions of her confinement were endangering her personal safety, limiting her to her cell because of the lack of day rooms, and resulting in food loss.

*Personal Safety*. August's concerns about personal safety involved: (1) possibility of injury, (2) sexual abuse and physical threats by officers and inmates, and (3) placement

in a shared cell with a sexual predator. ECF 43-5, PgID 1373–74. Defendants do not present contrary facts. August stated that fights occurred frequently, and the Facility's records show that violent incidents increased from 21 in 2010 to 74 in 2015. *Compare* ECF 43-9, PgID 1411 *with id.* at 1532.[8] August further presented that the "lack of supervision" by the Facility's officers placed her "at risk of harm[.]" ECF 43-5, PgID 1373. August therefore has demonstrated that she "reasonably feared" that she would be attacked, *Thompson*, 29 F.3d at 242 (citing *Marsh v. Arn*, 937 F.2d 1056, 1065 n.5 (6th Cir. 1991)), and has satisfied the Eighth Amendment's objective prong.

*Limited Movement.* August alleged that the Facility's increased population diminished day room space and access to those spaces. She failed, however, to identify a specific necessity of civilized life of which she had been deprived.

*Food.* August's grievance also alleged that she was "not getting a full state portion of food most days and food service seems to run out of alot [sic] of food on a regular basis." ECF 43-5, PgID 1373. The allegation fails the Eighth Amendment's objective prong of a substantial risk of serious harm. Inadequate food provisions do "not result in a health risk to the prisoner sufficient to qualify as a 'wanton infliction of pain' where the prisoner continues to receive adequate nutrition." *Richmond*, 450 F. App'x at 456 (citing *Cunningham v. Jones*, 667 F.2d 565, 566 (6th Cir. 1982)) (finding that withholding all but seven meals throughout six days was not a violation of the Eighth Amendment).[9] August

---

[8] Although there were more violent incidents in 2014 than in 2015, *see* ECF 43-9, PgID 1516, violent incidents have increased dramatically as the population of the Facility has increased.

[9] Even if the Court construed August as seeking damages for mental anguish related to her food portions, the Prisoner Litigation Reform Act would preclude the claim. *See*

did not allege or produce facts showing she suffered inadequate nutrition because of variable or delayed meal distribution.

August therefore satisfied the Eighth Amendment's objective prong for issues related only to her personal safety but not for issues related to limited movement or food.

### b. Subjective Component

August must also demonstrate that Washington and Stewart knew facts leading to the inference that August faced a substantial risk of serious harm and that they drew the inference. Two of August's letters to Washington and Stewart detailed her fears for her personal safety. *See* ECF 43-5, PgID 1387–90. Moreover, Stewart reviewed the denial of August's grievance detailing her concerns. Defendants do not refute August's submissions. Facts therefore exist by which a reasonable person could draw the inference that August faced a substantial risk of serious harm.

### 3. Medical Needs

August's letters and grievance provide greater detail of her mental health. August claims she was diagnosed with PTSD, anxiety, severe depression, borderline personality disorder, and OCD. ECF 43-5, PgID 1387; *see* ECF 43-12, PgID 1564–66 (containing Dr. Koch's report on August's mental health). The letters state that overcrowding "exacerbated" August's mental health. ECF 43-5, PgID 1390. August further details the delays she experienced in receiving mental health treatment. *Id.* at 1387, 1390. August did receive ongoing treatment, albeit with delays. *See, e.g.*, ECF 43-5, PgID 1387 (describing two to three increases in her medication during the "last few months"). Despite

---

*Richmond*, 450 F. App'x at 456 (citing 42 U.S.C. § 1997e(e), which bars claims by a prisoner for mental or emotional injury without a prior showing of physical injury).

the poor conditions alleged, August does not allege that the delay in medical treatment or other conditions affecting her mental health caused her a physical injury.

The Prison Litigation Reform Act prohibits prisoner civil actions "for mental or emotional injur[ies] suffered while in custody without a prior showing of physical injury[.]" 42 U.S.C. § 1997e(e). Absent a physical injury related to the Facility's failure to provide mental health treatment, August cannot maintain her civil action. *See Powell v. Washington*, 720 F. App'x 222, 229 (6th Cir. 2017).[10]

*4. Remaining Claim for Damages*

The only claim that remains, therefore, is August's claim for damages against Washington and Stewart in their individual capacities for a violation of her Eighth Amendment right to be free from overcrowded conditions that result in endangerment to her personal safety. The claim, however, is limited to the harms August experienced beginning in 2015; specifically, in June 2015 as to Stewart and in December 2015 as to Washington because those dates represent when the Defendants became "aware of facts from which the inference could drawn that a substantial risk of serious harm" to August existed. *Brown*, 207 F.3d at 867 (quoting *Farmer*, 511 U.S. at 835).

G.    § 1983 Liability for Supervisors.

The foregoing establishes a genuine dispute of material fact regarding whether August faced a substantial risk of serious harm to her personal safety resulting from

_____

[10] Even if August could maintain her action for the deterioration of her mental health, she would have to make a showing that her treatment was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rhinehart*, 894 F.3d at 737 (citing *Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005)). August failed to make the showing. Moreover, August cannot show that either Washington or Stewart acted to delay her medical treatment, and neither can be liable as a supervisor under § 1983.

overcrowding. Moreover, Washington and Stewart knew facts from which they could draw the inference that August faced serious harm. But, in a § 1983 action, the plaintiff must establish that "the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it," or "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Leary v. Daeschner*, 349 F.3d 888, 903 (6th Cir. 2003) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)).

A genuine issue of material fact exists regarding whether Washington and Stewart acquiesced in the officers' failure to properly operate the Facility and thus place August at risk of harm to her personal safety. *See Leary*, 349 F.3d at 903 (describing that summary judgment for a prison warden in a § 1983 action was improper when a genuine issue of material fact existed "as to whether the warden was aware and acquiesced in his subordinates' failure" to follow protocol).

H.    Qualified Immunity

State officials or employees sued in their individual capacities for monetary damages sometimes enjoy qualified immunity. Qualified immunity is "an immunity from suit rather than a mere defense to liability[.]" *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis omitted). The qualified-immunity analysis involves two parts.  First, the Court considers whether the facts, "when taken in the light most favorable to the party asserting the injury, show the [defendant's] conduct violated a constitutional right[.]" *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001)). Second, the Court determines whether the right was "clearly established such 'that a reasonable official would understand that what he is doing violates that right.'" *Id.*

(quoting *Saucier*, 533 U.S. at 201–02). The Court may use its discretion to determine which prong to analyze first. *Id.* (applying *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Ultimately, "[p]laintiff bears the burden of showing that defendants are not entitled to qualified immunity." *Maben v. Thelen*, 887 F.3d 252, 269 (6th Cir. 2018) (citing *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009)).

Defendants argue they are entitled to qualified immunity based on the first prong because "Plaintiffs fail to demonstrate a violation of their constitutional rights." ECF 41, PgID 1005. The Court finds, however, that Plaintiff demonstrated that Washington and Stewart violated the Eighth Amendment by failing to act to remedy August's reasonable fear of harm to her personal safety resulting from overcrowding.

As for the second prong, the Supreme Court previously recognized that a "prison official may be held liable for 'deliberate indifference' to a prisoner's Eighth Amendment right to protection against violence while in custody if the official 'knows that [the] inmat[e] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it[.]'" *Ortiz v. Jordan*, 562 U.S. 180, 190 (2011) (citing *Farmer*, 511 U.S. at 834, 847); *see also Thompson*, 29 F.3d at 242 (collecting cases showing that prisoner personal-safety claims must establish only that the prisoner reasonably feared for her safety). Based on existing law at the time of Defendants' inaction, a reasonable official in Washington or Stewart's position would know that failure to address a substantial risk of serious harm to a prisoner arising from overcrowding would violate her constitutional rights. Defendants are therefore not entitled to qualified immunity.

**ORDER**

**WHEREFORE**, it is hereby **ORDERED** that Defendant Michigan Department of Corrections is **DISMISSED** with prejudice.

**IT IS FURTHER ORDERED** that Plaintiffs' motions for class certification [39, 40] are **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment [41] is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that only August's claim for monetary damages as described *supra.* Part IV.F.4 remains.

**IT IS FURTHER ORDERED** that the parties shall **FILE**, no later than October 19, 2018, a joint status report regarding the possibility of settlement and proposing dates for trial.

**SO ORDERED**.

s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: September 29, 2018

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 29, 2018, by electronic and/or ordinary mail.

s/David P. Parker
Case Manager